TOSHIBA AMERICA MEDICAL SYSTEMS, INC. *v.*
MOBILE MEDICAL SYSTEMS, INC., ET AL.
(AC 17755)

O'Connell, C. J., and Lavery and Hennessy, Js.

Argued January 12—officially released May 25, 1999

*Christopher M. Royston*, for the appellant (defendant Paul Petonito).

*Andrew P. Nemiroff*, with whom, on the brief, was *Andrew K. Solow*, legal intern, for the appellee (plaintiff).

*Opinion*

LAVERY, J. The defendant Paul Petonito[1] appeals, following a trial to the court, from the judgment in favor of the plaintiff, Toshiba America Medical Systems, Inc.,

---

[1] The defendant Mobile Medical Systems, Inc., was defaulted for failing to plead and is not a party to this appeal. We refer in this opinion to Petonito as the defendant.

on its breach of contract claims. On appeal the defendant claims that the trial court improperly (1) pierced the corporate veil and imposed liability on the sole shareholder despite finding that the defendants' breaches of contracts did not rise to the level of deceptive, unethical or immoral acts, (2) imposed liability on the sole individual shareholder on the basis of payments made by Mobile Medical Systems, Inc. (Mobile), to another corporation that is not a party to the lawsuit and (3) imposed liability for corporate obligations on the sole individual shareholder where (a) the plaintiff knew it was dealing with Mobile, (b) the contracts were between the plaintiff and Mobile, (c) the plaintiff did not allege that it was fraudulently induced to enter into contracts with Mobile and (d) the individual defendant had no obligations to the plaintiff at the time that Mobile was formed. We affirm the judgment of the trial court.

The plaintiff's amended complaint alleges four counts of breach of contract by the defendants, Mobile and Petonito, and that Petonito is personally liable for the debts of the corporation. The fifth count alleges that the defendants wrongfully took the plaintiff's property and seeks treble damages pursuant to General Statutes § 52-564. In the sixth count, the plaintiff alleges that the defendants violated the Connecticut Unfair Trade Practices Act (CUTPA), General Statutes § 42-110a et seq.

The trial court found the following facts. The plaintiff is in the business of distributing and selling nuclear diagnostic imaging equipment. Petonito owned 100 percent of the stock in Mobile, which was originally capitalized with $100. Petonito did not pay for his stock. In 1992, Petonito caused Mobile to be incorporated because he wanted physicians to know that Mobile was a medically oriented company. Mobile operated its

corporation from the same premises as another corporation owned by Petonito, A-K Machine Company (A-K Machine), which sold medical vans. Mobile had no lease arrangement for the rental of the premises. Mobile had no corporate assets beyond an automobile used solely by Petonito. Following its incorporation, Mobile held no corporate meetings, did not file any tax returns or annual reports with the secretary of the state as to its corporate existence. Although he was subpoenaed to produce Mobile's corporate records at trial, Petonito failed to do so. Mobile had no employees. Patricia Ivarone, an employee of A-K Machine, wrote checks from the Mobile corporate account at the direction of Petonito but did not receive compensation from Mobile.

Mobile was engaged in the manufacture and sale of mobile diagnostic systems and entered into four contracts with the plaintiff to purchase nuclear diagnostic imaging equipment to be installed in its mobile diagnostic systems. Although it received the contracted goods from the plaintiff, Mobile failed to make full payment and was indebted to the plaintiff in excess of $424,000. Petonito received payments in excess of $900,000 from third party leasing companies for medical systems manufactured by Mobile that contained the equipment it purchased from the plaintiff. Petonito controlled the transfer of $1,184.910.19 from Mobile to A-K Machine, describing it as compensation for research and development. There were no records of loans from Mobile to A-K Machine.

The trial court also found that Petonito drew down at least $87,123.58 of Mobile's funds without explanation. Petonito paid his personal income tax to the Internal Revenue Service with funds from Mobile. Using Mobile funds, Petonito paid $44,375 in cash gifts to one of the plaintiff's employees, who was responsible for arranging credit to Petonito for Mobile. Petonito also permitted his son, who was not an officer, director or employee, to authorize payments from Mobile funds.

The trial court concluded from the intermingling of funds and monetary exchanges between Mobile and Petonito that Mobile was the alter ego of Petonito. Mobile was a shell that permitted Petonito to make unsupported withdrawals and payments to another corporation of which he was the sole stockholder. There was a unity of ownership between Mobile and Petonito and the corporation ceased to have any effect because, although it was incorporated, it never functioned. Mobile's separate identity was, in fact, a fiction to defeat individual liability. Mobile was so controlled and dominated by Petonito, and lacked a legitimate corporate purpose, that justice required imposing liability on the real actor, Petonito. The trial court rendered judgment and awarded damages in favor of the plaintiff on the first four counts of its amended complaint.[2]

The trial court found that the plaintiff failed to prove the wrongful taking of any property pursuant to § 52-564. It also found that the breaches of contracts by nonpayment for goods received did not rise to the level of deceptive, unethical or immoral acts on the part of the defendants in violation of CUTPA. The trial court, accordingly, rendered judgment for the defendants on the fifth and sixth counts of the amended complaint. This appeal followed.

I

Petonito's first claim is that the trial court improperly pierced Mobile's corporate veil and imposed liability on him as the sole shareholder despite finding that the defendants' breaches of contracts did not rise to the level of deceptive, unethical or immoral acts. We do not agree.

---

[2] The judgment was subsequently opened so that the plaintiff could present evidence of the defendants' having agreed to pay interest as a late penalty and attorney's fees pursuant to contract. The trial court rendered judgment awarding the plaintiff damages, interest and attorney's fees.

"In making our determination whether the trial court's conclusions were legally and logically correct, were based upon factual findings that were supported by the evidence and were not clearly erroneous; *Pandolphe's Auto Parts, Inc.* v. *Manchester*, 181 Conn. 217, 221, 435 A.2d 24 (1980); we do not retry the facts. *Jones* v. *Litchfield*, 1 Conn. App. 40, 42, 467 A.2d 936 (1983), cert. denied, 192 Conn. 802, 470 A.2d 1218 (1984). We are, however, not unmindful that the corporate shield should not be lightly disregarded to hold a stockholder liable, even when, as in the present case, there is but one stockholder. 'To do so would be to act in opposition to the public policy of this state as expressed in legislation concerning the formulation and regulation of corporations.' *Saphir* v. *Neustadt*, [177 Conn. 191, 212, 413 A.2d 843 (1979)]." *Falcone* v. *Night Watchman, Inc.*, 11 Conn. App. 218, 221–22, 526 A.2d 550 (1987).

The trial court determined that the facts of this case warranted its piercing Mobile's corporate veil and holding Petonito individually liable for breach of contract. The trial court found sufficient evidence to pierce the corporate veil under both the instrumentality rule; see *Angelo Tomasso, Inc.* v. *Armor Construction & Paving, Inc.*, 187 Conn. 544, 553, 447 A.2d 406 (1982); and the identity rule. See id., 554. We address each rule separately.

"The instrumentality rule requires, in any case but an express agency, proof of three elements: (1) Control, not mere majority or complete stock control, but complete domination, not only of finances but of policy and business practice *in respect to the transaction attacked* so that the corporate entity as to this transaction had at the time no separate mind, will or existence of its own; (2) that such control must have been used by the defendant to commit fraud or wrong, to perpetrate the violation of a statutory or other positive legal duty, or a dishonest or unjust act in contravention of plaintiff's

legal rights; *and* (3) that the aforesaid control and breach of duty must proximately cause the injury or unjust loss complained of." (Emphasis in original; internal quotation marks omitted.) Id., 553.

The trial court found that Petonito received payments in excess of $900,000 from third party leasing companies for medical systems manufactured by Mobile that contained the equipment it purchased from the plaintiff. Petonito transferred more than $1,100,000 from Mobile to A-K Machine. After its incorporation, Mobile held no corporate meetings to approve such transactions and did not file any tax returns or other documentary proof with the secretary of the state as to its corporate existence. Mobile had no employees. The trial court reasonably could have concluded that Petonito transferred funds from Mobile to A-K Machine to avoid paying the plaintiff the balance due it pursuant to the contracts Mobile entered into, and that the failure to pay breached the contracts and was the proximate cause of the plaintiff's injury.

"The identity rule has been stated as follows: If the plaintiff can show that there was such a unity of interest and ownership that the independence of the corporations had in effect ceased or had never begun, an adherence to the fiction of separate identity would serve only to defeat justice and equity by permitting the economic entity to escape liability arising out of an operation conducted by one corporation for the benefit of the whole enterprise." (Internal quotation marks omitted.) Id., 554. "There must be such domination of finances, policies and practices that the controlled corporation has, so to speak, no separate mind, will or existence of its own and is but a business conduit for its principal." (Internal quotation marks omitted.) Id., 556.

The trial court also found that Mobile operated from the premises of A-K Machine, had no employees and

had no equipment or property other than an automobile for Petonito's use. Petonito used Mobile funds to pay his personal income tax to the Internal Revenue Service and permitted his son to write checks on Mobile's account. Clearly, Petonito was the alter ego of Mobile. Mobile existed as a shell that permitted Petonito to make unsupported withdrawals and payments to A-K Machine, a corporation of which he was also the sole shareholder.

Petonito argues that the trial court improperly pierced the corporate veil because it did not find that the defendants' breaches of contracts rose to the level of deceptive, unethical or immoral acts. Petonito's argument takes the trial court's conclusion out of context. The trial court concluded that the defendants' breach of the four contracts in question did not rise to the level of a CUTPA violation with respect to the sixth count of the amended complaint.[3] The instrumentality rule merely requires the trial court to find that the defendants committed an unjust act in contravention of the plaintiff's legal rights. Here, Mobile entered into four

[3] "It is well settled that in determining whether a practice violates CUTPA we have adopted the criteria set out in the cigarette rule by the federal trade commission for determining when a practice is unfair: (1) [W]hether the practice, without necessarily having been previously considered unlawful, offends public policy as it has been established by statutes, the common law, or otherwise—whether, in other words, it is within at least the penumbra of some common law, statutory, or other established concept of unfairness; (2) whether it is immoral, unethical, oppressive, or unscrupulous; (3) whether it causes substantial injury to consumers [competitors or other businessmen]. . . .

"All three criteria do not need to be satisfied to support a finding of unfairness. A practice may be unfair because of the degree to which it meets one of the criteria or because to a lesser extent it meets all three. . . . Thus a violation of CUTPA may be established by showing either an actual deceptive practice . . . or a practice amounting to a violation of public policy. . . . Furthermore, a party need not prove an intent to deceive to prevail under CUTPA." (Citations omitted; internal quotation marks omitted.) *Cheshire Mortgage Service, Inc.* v. *Montes*, 223 Conn. 80, 106, 612 A.2d 1130 (1992).

contracts with the plaintiff to purchase certain equipment. Mobile never paid for the equipment because Petonito diverted the moneys received to A-K Machine in violation of the plaintiff's right to be paid under the contracts.

"When the statutory privilege of doing business in the corporate form is employed as a cloak for the evasion of obligations, as a mask behind which to do injustice, or invoked to subvert equity, the separate personality of the corporation will be disregarded." (Internal quotation marks omitted.) *United Electrical Contractors, Inc.* v. *Progress Builders, Inc.*, 26 Conn. App. 749, 755, 603 A.2d 1190 (1992). We, therefore, conclude that the trial court did not improperly pierce Mobile's corporate veil and impose liability on Petonito.

## II

Petonito's second claim is that the trial court improperly imposed liability on him as the sole shareholder on the basis of the payments made by Mobile to A-K Machine, a corporation that is not a party to this lawsuit. We are not persuaded.

In support of his claim, Petonito relies on *Angelo Tomasso, Inc.* v. *Armor Construction & Paving, Inc.*, supra, 187 Conn. 544, and quotes the following language therefrom. "The identity rule primarily applies to prevent injustice in the situation where two corporate entities are, in reality, controlled as one enterprise because of the existence of common owners, officers, directors or shareholders and because of the lack of observance of corporate formalities between the two entities." Id., 560. We do not disagree with this statement of the law with respect to the identity rule and hold that it applies to the situation before us where the facts demonstrate that Petonito was the common owner and officer of both Mobile and A-K Mobile and there was a failure to observe corporate formalities between the two entities.

We do not find, however, that the facts of the case before us are in any way similar to the facts of *Angelo Tomasso, Inc.* See id., 546–52 (officers of defendant corporation were sued on corporate line of credit they personally guaranteed and brought third party indemnification action against individual who appointed them to serve as officers of corporation but who, in fact, controlled corporation). We further disagree with Petonito that *Angelo Tomasso, Inc.*, holds that A-K Mobile had to be a party to the present litigation in order to pierce Mobile's corporate veil to impose liability on Petonito.

### III

Petonito's final claim is that the trial court improperly imposed liability on him because the plaintiff knew it was dealing with Mobile, the contracts were between the plaintiff and Mobile, the plaintiff did not allege it was fraudulently induced to enter into contracts with Mobile, and Petonito owed no obligations to the plaintiff at the time Mobile was formed. Petonito cites no law to support any of these claims although he cited numerous cases from this jurisdiction that concern piercing the corporate veil. The facts of those cases cited by Petonito in which liability was not imposed are all easily distinguishable from the facts of the case before us. See *Campisano* v. *Nardi*, 212 Conn. 282, 291, 562 A.2d 1 (1989) (state dissolved corporation by forfeiture but sole shareholder continued to do business during winding up); *Angelo Tomasso, Inc.* v. *Armor Construction & Paving, Inc.*, supra, 187 Conn. 544. Petonito would also have us distinguish the facts of this case from a case in which the corporate veil was pierced and liability imposed on an individual. See, e.g., *Zaist* v. *Olson*, 154 Conn. 563, 227 A.2d 552 (1967).[4] On the basis of our

---

[4] "[T]he plaintiffs rendered services, supplied materials and furnished equipment to The East Haven Homes, Inc., for work on properties owned or leased by Martin Olson and Martin Olson, Inc., or by corporations subse-

analysis of the law and facts, we conclude that *Zaist* is on point with the facts before us.

The judgment is affirmed.

In this opinion the other judges concurred.

---

quently merged into the latter; that the services, material and equipment were furnished at the instance and request of Martin Olson, who was an officer and director and the person in general charge of the affairs of The East Haven Homes, Inc.; that this corporation acted as the agent or instrumentality of Martin Olson and of Martin Olson, Inc., of which Martin Olson was also an officer and director and the person in general charge; that the services rendered and the material and equipment furnished inured to the benefit of Martin Olson and Martin Olson, Inc. . . ." *Zaist* v. *Olson,* supra, 154 Conn. 565.